United States Court of Appeals United States Court of Appeals
For the First Circuit For the First Circuit

No. 94-1258

WILLIAM AND RITA ESPEAIGNNETTE,

Plaintiffs, Appellants,

v.

GENE TIERNEY COMPANY, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Morton A. Brody, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Stahl, Circuit Judge.

Brian L. Lincicome with whom Cozen and O'Connor, Ted Susi, and
Laney and Susi were on brief for appellants.
Roy E. Thompson, Jr. with whom Elizabeth G. Knox and Thompson &
Bowie were on brief for appellee.

December 28, 1994


STAHL, Circuit Judge. Plaintiffs-appellants STAHL, Circuit Judge.

William and Rita Espeaignnette brought this action seeking

damages for the loss of William Espeaignnette's lower right

arm in an accident involving a lumber-mill saw designed and

manufactured by defendant-appellee Gene Tierney, Inc. ("the

Company"). Following a four-day trial, a jury returned a

special verdict in favor of the Company, specifically finding

that the saw was not defectively designed. The district

court entered judgment for the Company and subsequently

denied the Espeaignnettes' post-trial motions. The

Espeaignnettes now appeal, assigning error to several of the

district court's evidentiary rulings. Because we hold that

the district court abused its discretion in excluding

evidence pertaining to subsequent modifications made to the

saw by Espeaignnette's1 employer, we vacate the judgment and

remand for new trial.

I. I.

Background Background

In 1990, Espeaignnette's employer, the Isaacson

Lumber Company ("Isaacson"), purchased a Bottom Arbor Gang

Saw, or "edger," designed and manufactured by the Company.

Isaacson employs the edger to "square" or "edge" slabs of raw

lumber. The edger operates in the following manner: First,



1. All references in the opinion to "Espeaignnette" refer
solely to William Espeaignnette.

-2- 2

the operator feeds slabs of raw lumber into the edger along a

roller table, passing the slabs through anti-kick fingers

that prevent the slabs from kicking back towards the operator

as they contact the saw blades. After passing through the

anti-kick fingers, powered infeed rollers grab the slabs and

pull them into the saw blades. As designed and manufactured,

the area surrounding the anti-kick fingers and the infeed

rollers is open and not guarded by any physical covering.

The operator controls the edger from a station

located at one end of the machine. During normal operation,

there is no need for the operator to approach the open space

near the anti-kick fingers and the infeed rollers, except to

inspect or listen for strips of "edged" wood that

occasionally "hang up" in the saw-blade area. When strips

become stuck in this area, the operator must stop the machine

and clear the work surface or risk damaging the saw blades.

Following installation of the machine,

Espeaignnette was trained to operate the edger and

subsequently ran it without incident for a period of two to

three weeks. According to his trial testimony, on October

11, 1990, at approximately 10:30 p.m., Espeaignnette heard a

noise that he thought indicated that a sliver of wood had

become stuck in the saw-blade section of the edger. At this

point, Espeaignnette had been working for sixteen hours, with

only a half-hour lunch break. Espeaignnette testified that

-3- 3

he walked to the side of the edger, crouched down, and peered

into the blades to investigate. Espeaignnette maintained

that he did not stop the edger while investigating the noise

because to do so would needlessly increase downtime,

explaining that the edger often emitted similar sounds that,

upon investigation, did not require a shutdown.

Espeaignnette testified that while he was crouched

beside the edger, he saw a sliver of wood work free from the

saw-blade area. He then attempted to stand up but, as he did

so, lost his balance and stumbled towards the edger. He

further testified that, as he stumbled, he reached out with

his right hand to balance himself and inadvertently stuck his

hand into the area of the infeed rollers, causing his right

glove to become caught on a roller. As a result, his arm was

crushed, pulled into the saw-blade area, and then severed

below the right elbow.2

Following the accident, Isaacson continued to use

the edger to cut raw lumber. In the summer of 1993,

approximately six months before trial, an Isaacson employee

modified the edger by welding to it a steel plate that

covered the open area by the infeed rollers and the anti-kick

fingers.



2. The Company maintains that the accident occurred because
Espeaignnette purposely, and not inadvertently, stuck his
hand into the area of the infeed rollers to free a piece of
wood.

-4- 4

Espeaignnette tried this action against the Company

solely on a theory of strict liability, alleging that the

edger was defectively designed and unreasonably dangerous

because of the lack of physical guards covering the infeed-

roller area. As co-plaintiff, Rita Espeaignnette sought

compensation for loss of consortium stemming from the

injuries to her husband.

Prior to trial, the Company moved in limine to

exclude all evidence pertaining to Isaacson's modification of

the edger, and the Espeaignnettes similarly moved to exclude

evidence about the absence of comparable accidents involving

edgers designed by the Company. The district court

provisionally granted the Company's motion and excluded the

modification evidence pursuant to Fed. R. Evid. 407 as a

subsequent remedial measure, subject, however, to the

condition that the Company not controvert at trial the

feasibility of such a modification.3 The court



3. Fed. R. Evid. 407 provides:

When, after an event, measures are taken
which, if taken previously, would have
made the event less likely to occur,
evidence of the subsequent measures is
not admissible to prove negligence or
culpable conduct in connection with the
event. This rule does not require the
exclusion of evidence of subsequent
measures when offered for another
purpose, such as proving ownership,
control, or feasibility of precautionary
measures, if controverted, or
impeachment.

-5- 5

provisionally denied the Espeaignnettes' motion and, over

objection, permitted the owner of the Company, Gene Tierney,

to testify about the absence of reports of other accidents

involving similar edgers designed by the Company.

During trial, the Espeaignnettes raised at least

twice the issue of the subsequent-modification evidence. The

district court declined to admit the evidence on each

occurrence. Although eventually finding that the issue of

feasibility had been clearly raised, the district court

nonetheless excluded the evidence pursuant to Fed. R. Evid.

403 because the prejudicial impact of the evidence outweighed

its probative value.4 The Espeaignnettes made an offer of

proof stating, inter alia, that they sought to call the

current operator of the edger to testify that he had operated

the edger both before and after its 1993 modification and

that the modification had in no way inhibited the operation

of the machine.

During trial, the district court also denied the

Espeaignnettes' objections to the qualification of a witness



4. Fed. R. Evid. 403 provides:

Although relevant, evidence may be
excluded if its probative value is
substantially outweighed by the danger of
unfair prejudice, confusion of the
issues, or misleading the jury, or by
considerations of undue delay, waste of
time, or needless presentation of
cumulative evidence.

-6- 6

for the Company as an expert in "industrial human factors"

and to that witness's testimony concerning whether it was

possible for Espeaignnette to have fallen into the edger as

he alleged.

Following closing arguments, the district court

submitted the case to the jury as a series of questions on a

special-verdict form. The first question was whether the

edger was "in a defective condition and unreasonably

dangerous." The jury answered this question in the negative

and, in accordance with the instructions on the form and the

district court's oral instructions, proceeded no further.

The jury did not answer the subsequent questions on proximate

cause and assumption of risk. Subsequently, the district

court entered judgment for the Company and denied the

Espeaignnettes' motions for judgment as a matter of law and a

new trial. This appeal followed.

II. II.

Discussion Discussion

The Espeaignnettes assign error to three

evidentiary rulings. They contend that the district court

erred in (1) excluding under Rule 403 evidence concerning

Isaacson's installation of the fixed metal guard on the

edger, (2) admitting evidence concerning the absence of other

accidents involving similar edgers designed by the Company,

and (3) qualifying a witness for the Company as an expert in

-7- 7

"industrial human factors" and permitting the witness to

testify on that subject. We discuss each argument in turn.

A. Subsequent Modification of the Edger

We begin by noting that a district court has

considerable latitude in determining whether to admit or

exclude evidence under Rule 403. See, e.g., Newell Puerto

Rico, Ltd. v. Rubbermaid, Inc., 20 F.3d 15, 21 (1st Cir.

1994). We review these rulings only for an abuse of

discretion. Daigle v. Maine Medical Ctr., Inc., 14 F.3d 684,

690 (1st Cir. 1994). "`Only rarely -- and in extraordinarily

compelling circumstances -- will we, from the vista of a cold

appellate record, reverse a district court's on-the-spot

judgment concerning the relative weighing of probative value

and unfair effect.'" Id. (quoting Freeman v. Package Mach.

Co., 865 F.2d 1331, 1340 (1st Cir. 1988)). 

Our review, however, is not completely without

bite. See, e.g., Kassel v. Gannett Co., 875 F.2d 935, 951-52

(1st Cir. 1989). In general, "[a]buse occurs when a material

factor deserving significant weight is ignored, when an

improper factor is relied upon, or when all proper and no

improper factors are assessed, but the court makes a serious

mistake in weighing them." Independent Oil & Chem. Workers

of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927,

929 (1st Cir. 1988).

-8- 8

The Espeaignnettes argue that the district court

abused its discretion in excluding pursuant to Rule 403

evidence regarding Isaacson's modification of the edger.

Primarily, they contend that the district court incorrectly

found that the danger of unfair prejudice outweighed the

probative value of the evidence. The Espeaignnettes argue

that the evidence was vital to establishing their prima facie

case of strict liability under Maine law and that the

district court vastly overestimated the danger of unfair

prejudice. After a careful review of both the applicable law

and the facts and circumstances surrounding this case, we

agree.5

The Espeaignnettes tried their claim against the

Company pursuant solely to Maine's strict liability

statute.6 Under the Maine statute, a plaintiff must prove



5. Because the district court excluded the evidence at trial
pursuant to Rule 403, its pre-trial ruling excluding the
evidence under Rule 407 as a subsequent remedial measure is
not at issue. Nevertheless, because we are remanding the
case for retrial, we note that circuit precedent clearly
establishes that Rule 407 does not apply to actions taken by
third parties such as Isaacson. Raymond v. Raymond Corp.,
938 F.2d 1518, 1524 (1st Cir. 1991).

6. The Maine strict liability statute provides:

One who sells any goods or products in a
defective condition unreasonably
dangerous to the user or consumer or to
his property is subject to liability for
physical harm thereby caused to a person
whom the manufacturer, seller or supplier
might reasonably have expected to use,
consume or be affected by the goods, or

-9- 9

that "the product was defectively designed thereby exposing

the user to an unreasonable risk of harm." Stanley v.

Schiavi Mobile Homes, Inc., 462 A.2d 1144, 1148 (Me. 1983).

See also St. Germain v. Husqvarna Corp., 544 A.2d 1283, 1285

(Me. 1988). To determine whether a product was defectively

designed, Maine courts apply the "danger-utility" test. St.

Germain, 544 A.2d at 1285. Under this test, proof of

defective design includes "an examination of the utility of

[the product's] design, the risk of the design and the

feasibility of safer alternatives."7 Stanley, 462 A.2d at



to his property, if the seller is engaged
in the business of selling such a product
and it is expected to and does reach the
user or consumer without significant
change in the condition in which it is
sold. This section applies although the
seller has exercised all possible care in
the preparation and sale of his product
and the user or consumer has not bought
the product from or entered into any
contractual relation with the seller.

Me. Rev. Stat. Ann. tit. 14, 221.

7. In describing the feasibility prong of the danger-utility
test, a leading authority explains that:

[a]n alternative design that was not
utilized is to be considered as feasible
when a reasonable person would conclude
that the (1) magnitude of the danger-in-
fact that could have been avoided by such
alternative design in the (2) utilization
of the scientific technological know-how
reasonably available to the defendant
outweighed the (1) financial costs of
guarding against such avoidable danger,
(2) the impairment of the benefits, and
(3) any new danger-in-fact that would

-10- 10

1148. See also Walker v. General Elec. Co., 968 F.2d 116,

119 (1st Cir. 1992).

In this case, the excluded evidence of the Isaacson

modification tends to show that the design and installation

of a physical guard was both possible and practical (i.e.,

placing a physical guard over the opening did not inhibit the

operation of the edger). Moreover, this evidence bears

directly on whether the edger was defectively designed. It

allows the jury to compare the utility and risk of the edger

as actually designed (without the guard) with the utility and

risk of the alternate design (with the guard). Therefore,

because the evidence was crucial to the Espeaignnettes' case,

unless the danger of unfair prejudice substantially

outweighed its probative value, the evidence should not have

been excluded. See Swajian v. General Motors Corp., 916 F.2d

31, 34-35 (1st Cir. 1990) (reversing exclusion under Rule 403

in products liability action where evidence bore directly on

event in issue); Laney v. Celotex Corp., 901 F.2d 1319, 1320-

21 (6th Cir. 1990) (reversing exclusion under Rule 403 where



have been created by the alternative
design.

W. Page Keeton et al., Prosser and Keeton on the Law of Torts
99 at 700 (5th ed. 1984) (emphasis supplied). Cf. St.
Germain, 544 A.2d at 1285-86 (evidence "that the safety
feature would minimally impair the use of the saw" supported
determination that evidence was sufficient to find a
defective condition and that, consequently, the trial court
had erred in directing verdict for manufacturer on strict
liability claim).

-11- 11

evidence "[went] to the fundamental question of the case").

Cf. Joseph W. Cotchett & Arnold B. Elkind, Federal Courtroom

Evidence 93 (3d ed. 1993) ("If the party's case turns upon

the introduction of the evidence, [Rule 403] favors the

admission of the evidence.").

The fact that the court permitted the

Espeaignnettes' expert to testify to the possibility of

placing a physical guard on the edger does not diminish the

probative value of the excluded evidence. The Company did

not dispute the fact that it would have been theoretically

possible to have installed a physical guard on the edger, but

it did vigorously dispute whether such a guard would be

practical. The designer of the edger, Gene Tierney, and the

Company's expert witness, Professor Barnett, testified that a

physical guard would unduly inhibit the normal operation of

the edger.8 The excluded evidence tends to show directly



8. Answering why he chose not to include a physical guard
over the open area of the edger where Espeaignnette was
injured, Tierney testified:

Utility of the machine. I have found,
almost without exception, that where you
have a guard bolted on, hinged, pinned
on, even clipped, they'll take it off
first time and it stays off. Then you
have that whole opening exposed.

Q. You didn't put a guard because you
were afraid someone would take it off?

A. I'm saying you use the utility of
that machine, how long do you anticipate
it would take to take the guard off

-12- 12



assuming they did put it back? What
would that --

Q. I'm sorry. Go ahead.

A. What would that do to operator stress
when his material is piling up on him.
That's going to make him fight it, so to
speak, to catch up. He's more prone to
error under those conditions. All those
factors are considered.

Professor Barnett testified:

The methodology of trying to get that
thing unjammed is simply horrific, and we
need every aperture available to us.
. . .
Put those guards on the side, if
they're permanently fixed on there, you
have now seriously compromised the
unjamming capability of the machine. If
you don't put them on permanently, then
the task will be we have to remove them
so we can get in there and do the
unjamming on the side. If you remove
them, then the machine is right back to
the one we're looking at in the front of
the room.

(Emphasis supplied). In his opening remarks, the Company's
counsel stated:

One of the reasons, you will learn,
that there is an opening in this very
area is it is mandatory that there be
access to do just what [the
Espeaignnettes' counsel] indicated, and
that is unjam, unplug what can happen in
there. There is a necessity to look in
that area and to, once the machine is
turned off, reach in and unplug it.

(Emphasis supplied). In addition, the Company's counsel
argued at closing:

This machine had to be designed to keep
this downtime to a minimum.

-13- 13

that a physical guard does not inhibit the operation of the

edger and therefore would have rebutted the testimony of

Tierney and Professor Barnett much more effectively than

hypothetical assertions by the Espeaignnettes' expert

witness.

Not only did the district court incorrectly gauge

the probative value of the testimony, it also overestimated

the danger of unfair prejudice. It is, of course, axiomatic

that "[a]ll evidence is meant to be prejudicial; elsewise,

the proponent would be unlikely to offer it." Daigle, 14

F.3d at 690. The appropriate inquiry under Rule 403,

therefore, is whether the evidence results in "unfair

prejudice." See Swajian, 916 F.2d at 34. "`Unfair



. . .
And I want you to think just for a
moment about some testimony relative to
the jams when the slab goes in and gets
really hung up in those rollers.
(Gesturing) To get that slab out, you're
going to have to go into the area between
the in-feed rollers and the kickback
fingers.
If you open up the machine and go in
this way, you're only getting one end of
it. You're not getting the major jam,
which is where -- the in-feed rollers and
the antikickback fingers. You had to
have access in that area.

(Emphasis supplied). Cf. Borden, Inc. v. Florida East Coast
Ry. Co., 772 F.2d 750, 756 (11th Cir. 1985) ("[A] litigant is
unduly prejudiced when his opponent is successful in
preventing the admission of evidence on a particularly
crucial issue in dispute, and then points to the absence of
such evidence in closing argument.")

-14- 14

prejudice' . . . means an undue tendency to suggest decision

on an improper basis, commonly, though not necessarily, an

emotional one." Fed R. Evid. 403 advisory committee's note.

In its final trial ruling, the district court

excluded the evidence, reasoning only that:

the prejudicial impact of that evidence
as it relates to Isaacson correcting the
machine or having the machine corrected,
the prejudicial impact of that evidence
outweighs the probative value of it
because the jury may very well infer from
that activity that that was -- they may
take that evidence as evidence of
negligence or product liability on the
part of the defendant rather than
evidence for which it is intended;
namely, the feasibility of putting that
or making that repair on the machine.

The district court viewed the evidence as

admissible (if at all) only to show feasibility under an

exception to Rule 407. Therefore, in weighing the

prejudicial impact of the evidence, the court examined

whether it would tend to show something more than just

feasibility (e.g. negligence or product liability). As

noted, however, because a third party, and not the Company,

modified the edger, the evidence of the modification was not

subject to exclusion under Rule 407. See supra note 5.

Therefore, the fact that the Espeaignnettes' proffered

evidence may have tended to show "negligence or product

liability" rather than just feasibility did not, by itself,

-15- 15

constitute an improper use of the evidence and warrant its

exclusion as unfairly prejudicial under Rule 403.

Moreover, once the analysis is conducted outside

the Rule 407 framework, we do not believe that the excluded

evidence posed any significant risk of unfair prejudice. The

Isaacson modification was not a subsequent design developed

well after the edger was manufactured. Hence, it was not

(arguably) misleading or unfairly prejudicial on the issue of

whether the edger was unreasonably dangerous at the time of

manufacture. See, e.g., Grenada Steel Indus., Inc. v.

Alabama Oxygen Co., 695 F.2d 883, 889 (5th Cir. 1983) (design

changes developed after the manufacture of the product in

question are irrelevant to the reasonableness of the design

at the time of manufacture). True, Isaacson did not install

a guard on the edger until more than two years after the

accident. The Company, however, does not contend that a

guard could not have been installed at the time of

manufacture or even that the installation was not considered.

Therefore, the Espeaignnettes' proffered evidence would not

have introduced design choices not known or feasible at the

time of manufacture.

Furthermore, the Company's failure in its brief to

illustrate how the excluded evidence would be "unfairly"

prejudicial to its case confirms our conclusion. The Company

argues only that the testimony would have been confusing and

-16- 16

misleading to the jury because the guard installed by

Isaacson was a different type of guard (a permanent guard)

than the guard recommended by the Espeaignnettes' expert (a

removable guard). Though this is a difference, we cannot say

that it is particularly confusing or unfairly prejudicial.

In sum, the proffered evidence posed no significant

risk of unfair prejudice.9

Nevertheless, we remain mindful of the substantial

deference that is properly accorded to a district court's

judgment in "`steadying the Rule 403 seesaw.'" Kassel, 875

F.2d at 952 (quoting Onujiogu, 817 F.2d at 6). The question

is not whether we would strike the balance differently in the

first instance, but whether the balance actually struck is so

egregiously one-sided that it requires reversal. Our

decision in Swajian v. General Motors Corp., 916 F.2d 31 (1st

Cir. 1990), in which we reversed a district court's decision



9. We also note that in its provisional ruling before trial,
the district court excluded the evidence under Rule 407, but
added, "I am more concerned, frankly, with prejudicial impact
that that kind of evidence would have on the jury;
specifically, that portion of the evidence which indicates
that the same machine, at the same place, in the same
factory, was in fact remedied to prevent this kind of
accident." The district court did not reiterate this
reasoning when it excluded the evidence under Rule 403. In
any event, we are unconvinced that the fact that the evidence
concerned the specific edger involved in the accident evokes
any special degree of unfair prejudice in this case.

-17- 17

in a products liability action to exclude evidence pursuant

to Rule 403, informs our analysis on this issue.10

In Swajian, the plaintiff's wife was killed when a

truck she had been driving rolled over in an accident. The

plaintiff contended that the truck's rear axle was defective

and had caused the accident. General Motors argued, however,

that driver error was the cause. The district court excluded

evidence that the decedent had been drinking prior to the

accident, finding that the evidence was "unduly inflammatory"

and that its prejudicial impact would far outweigh its

probative value. Id. at 34. 

On appeal, we reversed, criticizing the district

court for its failure in striking the Rule 403 balance to

distinguish between evidence that is prejudicial and evidence

that is unfairly prejudicial. Id. at 35. Moreover, we

stressed that the evidence was highly probative because it

bore directly on the issue of causation. Id.

As in Swajian, the evidence excluded here bore

directly on an essential element of the plaintiff's prima



10. Even though Swajian suggests that, there, the district
court erred as a matter of law by not making a specific
finding of "unfair prejudice," the opinion is best
interpreted as holding that the district court abused its
discretion in conducting the balancing that Rule 403
requires. This can be deduced from the Swajian panel's
review of the district court's balancing of probative value
against prejudicial impact, Swajian, 916 F.2d at 34, which,
in turn, supports a conclusion that the district court abused
its discretion in striking the balance in this case.

-18- 18

facie case. Furthermore, as compared to the circumstances of

this case, we think that the risk of unfair prejudice in

Swajian was decidedly more pronounced. In Swajian, a real

danger undoubtedly existed that the jury would have taken the

evidence of the decedent's drinking as showing that she was

at fault and not entitled to compensation, regardless of

whether or not the axle failure caused the accident. In

contrast, as we have explained above, the evidence excluded

in this case posed little, if any, risk of unfair prejudice.

In sum, we are convinced that the excluded evidence

was highly probative on an essential disputed element in the

case and that the danger of unfair prejudice was extremely

remote. Accordingly, we hold that the district court abused

its discretion in excluding the proffered evidence.11

Our determination that the district court abused

its discretion in striking the Rule 403 balance does not,

however, end our analysis. As with most trial errors, we are

not empowered to notice error in a district court's

evidentiary ruling "unless a substantial right of the party



11. We further note that the cases on which the Company
relies to support excluding the evidence are clearly
distinguishable. See Harrison v. Sears, Roebuck & Co., 981
F.2d 25, 31-32 (1st Cir. 1992) (negligence and breach of
warranty action, evidence offered to impeach only); Raymond,
938 F.2d at 1523-24 (feasibility stipulated and design
modification developed after manufacture of product); Grenada
Steel, 695 F.2d at 888-89 (feasibility clearly not contested
and design changes developed years after manufacture of
product).

-19- 19

is affected." Fed. R. Evid. 103(a); see also Fed. R. Civ. P.

61. In determining whether an error affected a party's

substantial right, "[t]he central question is whether this

court can say with fair assurance . . . that the judgment was

not substantially swayed by the error." Lubanski v. Coleco

Indus., Inc., 929 F.2d 42, 46 (1st Cir. 1991) (internal

quotations omitted).

The exclusion of the proffered testimony cannot be

considered harmless. As noted, the evidence directly

pertains to whether the edger was unreasonably dangerous at

the time of manufacture. Therefore, we cannot say that its

absence did not substantially affect the jury's decision on

this point.

Furthermore, the only issue the jury considered was

whether the edger was unreasonably dangerous. In accord with

the court's instructions, the jury returned a single finding

that the edger was not "in a defective condition and

unreasonably dangerous." The jury did not answer the

subsequent questions on the special-verdict form concerning

proximate cause and assumption of risk. As a result, because

the exclusion of the evidence undermined the jury's sole

finding that the edger was not in a defective condition, it

therefore affected a substantial right of the Espeaignnettes.

B. Absence of other accidents

-20- 20

The Espeaignnettes contend that the district court

erred in admitting evidence concerning the lack of similar

accidents involving edgers designed by the Company. The

Espeaignnettes argue that this evidence is irrelevant in a

strict liability action and, in the alternative, that the

Company failed to establish a proper foundation for the

evidence. The Espeaignnettes fail on both grounds.

As an initial matter, we note that both parties

argued this issue before the district court and in their

briefs as though it were controlled by state law. Neither

side discussed the applicability of the Federal Rules of

Evidence. Nevertheless, it is axiomatic that in determining

whether evidence is relevant, and therefore admissible in a

diversity action, the Federal Rules of Evidence supply the

appropriate rules of decision. See, e.g., McInnis v. A.M.F.,

Inc., 765 F.2d 240, 245-46 (1st Cir. 1985); Fed. R. Evid.

1101. Normally, the Espeaignnettes' failure to argue the

correct applicable standard would effect a waiver of the

issue. Because we are remanding the issue for retrial,

however, we will proceed to discuss the issue as it arises

under the Federal Rules of Evidence.

Subject to certain limitations, all evidence is

admissible if it is relevant -- i.e., if it tends to make the

existence or nonexistence of a disputed fact "more probable

than it would be without the evidence." Fed. R. Evid. 401,

-21- 21

402. As we have discussed earlier, a district court may

nonetheless exclude relevant evidence if the probative value

of the evidence is "substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the

jury, or by considerations of undue delay, waste of time, or

needless presentation of cumulative evidence." Fed. R. Evid.

403.

In general, courts have recognized that the absence

of prior accidents may be admissible to show:

(1) absence of the defect or other
condition alleged,
(2) the lack of a causal relationship
between the injury and the defect or
condition charged, [and]
(3) the nonexistence of an unduly
dangerous situation.

Strong, 1 McCormick on Evidence 200 at 850-51. Moreover,

we recently rejected the argument that evidence of the lack

of prior accidents is irrelevant on the issue of causation in

a products liability case brought on a negligence theory.

Harrison v. Sears, Roebuck & Co., 981 F.2d 25, 30 (1st Cir.

1992). See also Keller v. United States, No. 94-1136, slip

op. at 27, 30 (1st Cir. Oct. 19, 1994) (noting evidence of

the absence of other accidents as supporting district court's

failure to find design defect or causation in negligence

case).12



12. The Espeaignnettes argue, however, that even if the
absence of prior accidents would be relevant in a negligence
case, the district court should still have excluded the

-22- 22

The evidence of the absence of prior accidents is

clearly relevant to several disputed issues in this case.

The fact that the Company had received no reports of similar

accidents tends to disprove causation. That there were no

similar reports of injuries due to inadvertent contact with

the infeed rollers tends to support the Company's contention

that it was not possible for Espeaignnette to have stumbled

accidentally into the open area of the edger as he alleged.

Additionally, the absence of prior accidents is probative and

relevant to whether the edger as designed was unreasonably

dangerous.

The Espeaignnettes alternatively contend that the

Company failed to establish the necessary foundation for

admission of the evidence. A review of the cases reveals,

for the most part, that evidence of the absence of prior

accidents may not be admitted unless the offering party first

establishes that the "lack of accidents was in regard to

products that are substantially identical to the one at issue

and used in settings and circumstances sufficiently similar

to those surrounding the machine at the time of the



evidence because the issue here turns solely on principles of
strict liability. This argument is not persuasive because
the Maine Supreme Judicial Court has recognized that
negligence and strict liability causes of action both share
the same elements of causation and defective design. See
Marois v. Paper Converting Mach. Co., 539 A.2d 621, 623 (Me.
1988) (causation) and Stanley, 462 A.2d at 1148 (defective
design).

-23- 23

accident." Klonowski v. International Armament Corp., 17

F.3d 992, 996 (7th Cir. 1994) (internal quotations omitted).

Whether such preliminary requirements are aimed at preventing

the admission of irrelevant evidence under Rule 402,

excluding relevant evidence that is unfairly prejudicial and

confusing under Rule 403, or both, is unclear. Cf. Fusco v.

General Motors Corp., 11 F.3d 259, 264 (1st Cir. 1993)

(foundational requirement of substantial similarity regarding

evidence of similar accidents "now loosely appended to Rule

403"). In any event, the determination of admissibility

turns on the facts and circumstances of each case and is

committed, in the first instance, to the sound discretion of

the district judge. See United States v. Brandon, 17 F.3d

409, 444 (1st Cir.), cert. denied, 115 S. Ct. 80, and cert.

denied, 115 S. Ct. 81 (1994); Fed. R. Evid. 104(a).

Prior to testifying about the lack of similar

accidents, Tierney testified that, since 1976, his company

had sold eighty-seven edgers using essentially the same open

infeed-roller design. He also testified that as president of

the Company any claims or notices of accidents involving an

edger designed and manufactured by the Company would have

come to his attention. While in different circumstances a

district court might require more to show sufficient

similarity, we think that Tierney's testimony established

that the evidence of the absence of other accidents was

-24- 24

admissible in this case. Furthermore, we note that the

Espeaignnettes' counsel soundly attacked this testimony

during cross-examination, bringing out that Tierney did not

know whether any of the machines had been modified or if they

had been situated so as to prevent accidental contact with

the infeed rollers.

C. Expert testimony

The Espeaignnettes' final complaint is that the

district court improperly permitted the Company's expert

witness to testify that it was not physically possible for

Espeaignnette to stumble and fall into the edger as he

contended. Specifically, the Espeaignnettes contend that the

Company's expert lacked sufficient qualifications to testify

as an "industrial human factors" expert in machine design.

They further argue that the subject of the testimony -- how

one reacts during a stumble -- was an improper subject for

expert testimony because it was within the knowledge of the

average juror. We do not agree.

Determinations of whether a witness is sufficiently

qualified to testify as an expert on a given subject and

whether such expert testimony would be helpful to the trier

of fact are committed to the sound discretion of the trial

court. See, e.g., Navarro de Cosme v. Hospital Pavia, 922

F.2d 926, 931 (1st Cir. 1991). "[A] trial judge's rulings in

this sphere should be upheld `unless manifestly erroneous.'"

-25- 25

United States v. Sepulveda, 15 F.3d 1161, 1183 (1st Cir.

1993) (quoting Salem v. United States Lines Co., 370 U.S. 31,

35 (1962)), cert. denied, 114 S. Ct. 2714 (1994); but compare

Williams v. Poulos, 11 F.3d 271, 282 (1st Cir. 1993) (stating

standard of review is abuse of discretion).

A review of Professor Barnett's vita and testimony

reveals that, although he has little formal education

regarding "industrial human factors," he does have extensive

professional experience in the field. His testimony was not

restricted to how a person reacts during a stumble. Rather

he gave important testimony explaining human interaction with

machines, an issue both important in evaluating the Company's

decision not to place a physical guard on the edger and

relevant to the Company's theory of causation. The district

court did not abuse its discretion in either accepting the

qualifications of Professor Barnett as an expert or admitting

his testimony.

III. III.

Conclusion Conclusion

For the foregoing reasons, we vacate the judgment

entered below and remand this case to the district court for

a new trial.

-26- 26